IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 09-10105-CIV-MOORE/SIMONTON

KYLE TAYLOR and JULIA TAYLOR
as Co-Personal Representatives of the
Estate of GORDON BENNETT TAYLOR,
their father, and the Estate of
BARBARA TAYLOR, their mother,

       Plaintiffs,

vs.

UNITED STATES OF AMERICA, on
behalf of THE FEDERAL AVIATION
ADMINISTRATION,

       Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendant's Motion for Summary Judgment (ECF No. 40). Plaintiffs filed a Response in Opposition (ECF No. 42). A Reply (ECF No. 48) was also filed.

UPON CONSIDERATION of the Motion, the Response, the Reply, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

**I.    BACKGROUND**[1]

In the early morning hours of November 7, 2008, flight N681KW, a Partenavia SPA P68C twin-engine aircraft, crashed about .6 nautical miles from Runway 29 at Gainesville Regional

---

[1] The facts are taken from Plaintiffs' Statement of Facts (ECF No. 42-1), from Defendant's Statement of Facts (ECF No. 40-2), and from the evidence in the record. They are stated herein in a light most favorable to Plaintiffs, the non-moving party.

Airport ("GNV"), killing the pilot Andrew Ricciuti ("Ricciuti") and his two passengers Gordon Bennett Taylor and Barbara Taylor ("the Taylors'"). The Taylors' daughters, Kyle and Julia, as co-personal representatives of the estates of the Taylors', filed suit against the United States of America ("United States") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and § 2671, claiming the Federal Aviation Administration ("FAA") breached its duty of care because Air Traffic Controller Clois Strickland ("Strickland") failed to provide proper air traffic control services to the pilot of flight N681KW.

Flight N681KW departed Key West International Airport ("EYW") at about 12:38 A.M.[2] Gordon Bennett Taylor was to receive a kidney transplant at Shands Hospital in Gainesville later that morning. The aircraft was owned by Robert Valle and leased to Florida Aero Charter, Inc., doing business as Air Key West. The company is an on-demand air taxi service that employed Ricciuti as a pilot. Plaintiffs contend that even though the aircraft and pilot were a part of the Air Key West operation, the subject flight was a personal flight conducted by Ricciuti free of charge due to the urgency of the situation.

To prepare for the flight, Ricciuti filed an Instrument Flight Rules ("IFR") flight plan[3] at 11:36 P.M., about an hour before departure. He also called Christopher Yarbrough ("Yarbrough")

---

[2] All times listed are in Eastern Standard Time.

[3] Under IFR conditions, pilots fly by referencing the instruments in the aircraft, as opposed to Visual Flight Rules ("VFR") conditions in which pilots can fly by visual reference to the ground and horizon. Barbosa v. United States, 811 F.2d 1444, 1445 n. 1 (11th Cir. 1987). Pilots fly under IFR conditions, when weather conditions are below "the minimum for flight under visual flight rules." Aeronautical Information Manual Pilot/Controller Glossary, IFR Conditions.

an employee at University Air, a fixed base operator[4] located at GNV, and from the Miami Flight Service Station ("Miami FSS") and received local weather information and forecasts for the night. Yarbrough recalls he told Ricciuti the weather was "foggy." The Miami FSS reported that the conditions were clear skies with 10 miles or greater visibility. When flying under IFR conditions, the minimum visibility requirements for an authorized Instrument Landing System (ILS) approach at GNV is .5 statute mile visibility. When the flight departed, the weather conditions were above the minimum requirements.

The Gainesville Air Traffic Control Tower is closed between 10:30 P.M. and 6:45 A.M. GNV therefore is equipped with automated systems to collect and disseminate information on weather conditions. The Automated Surface Observation System ("ASOS") receives weather data recorded by instruments at GNV and generates weather reports and updates. There are two kinds of weather reports generated by ASOS–routine aviation weather reports ("METARs") and special aviation weather reports ("SPECIs"). GNV also has an Automatic Terminal Information Service ("ATIS") frequency, on which certain weather updates generated by the ASOS are broadcast. When arriving or departing from airports that are closed, as GNV was during the subject flight, pilots use the Common Traffic Advisory Frequency ("CTAF"), which allows pilots to communicate with aircrafts in the vicinity of GNV and the Washington, D.C. Flight Service Station ("Washington FSS").

Flight N681KW was equipped with a Garmin GMX-200 multi-function display ("MFD"). This type of MFD, with a data link and subscription to XM WX Satellite Weather Service, displays

---

[4] A fixed-based operator provides services to flights at base airports. Such services include parking, fueling, tie-downs, bases, hangar operations, and aircraft detailing. Dep. Christopher Yarbrough ("Yarbrough Dep."), at 6:23-25 (ECF No. 40-16).

color-coded icons for airports along a flight path that have ASOS systems. The MFD on flight N681KW was programmed to show these icons automatically. The colors indicate whether a pilot could land under VFR conditions or should conduct an ILS approach because of adverse IFR conditions. The MFD collects this information from automated weather reporting systems, such as the ASOS at GNV. The red icon indicates a low IFR. In other words, it shows that visibility is low–at least below three miles. If the pilot chose, he could press a button and display the text of the most recent METARs and SPECIs for any airport along his flight path.

When N681KW departed, the forecast for GNV was greater than 6 miles visibility until 1:00 A.M. and about 4 miles visibility in mist from 1:00 A.M. to 3:00 A.M. At 2:13 A.M., Ricciuti told a Tampa air traffic controller: "Yes sir it's ah looks like the weather is kinda tanking pretty good up at ah Gainesville ah just a heads up I'm guessing I'd like to probably take a shot at it. I've got somebody on board that's trying to get a kidney actually and if not we'll probably be looking at going over to St. Augustine." Minutes later, at 2:15 A.M., a SPECI was issued for GNV indicating .25 statute mile visibility with a vertical visibility of 100 feet above ground level and fog. It is undisputed that such conditions are below minimum for an ILS approach, and that these conditions remained until after the plane crashed.

Moments after the SPECI was issued, Ricciuti established contact with Strickland who was on duty at the Jacksonville Terminal Radar Approach Control ("Jacksonville TRACON"). Ricciuti was about 70 miles from GNV. The following exchange occurred:

> Strickland (2:16:08 A.M.): November six eight one kilo whiskey, approach Jax. Altimeter three zero zero two. No weather information available for Gainesville.
>
> Ricciuti (2:16:16 A.M.): [T]he weather looks like it's going up and down sir. Actually looks like a real thin fog layer. Ah, we're kind of a priority trying to get into ah get a kidney

transplant um but it's ah if it's undoable at Gainesville we'll probably be looking at St. Augustine just to give you a heads up.

At 2:36 A.M., Kyle Taylor received a cell phone call from her father's phone. It is disputed whether she spoke to her mother or father and what was said–Defendant claims that Kyle Taylor told a detective that she had spoken to her father who told her it was very foggy and they would attempt one more landing, otherwise they may be diverted to St. Augustine.[5] At 2:42:13 A.M., Strickland cleared Ricciuti to attempt an ILS approach onto Runway 29 at GNV. At 2:43 A.M. Strickland told Ricciuti: "radar service terminated change to advisory approved." This exchange presumably means that Ricciuti was to switch to the CTAF frequency. Rather than go directly to CTAF, Ricciuti first contacted Yarbrough at GNV, who he had spoken with before departing about the weather conditions at the airport. Yarbrough remembers telling Ricciuti it was "very foggy" and that he could not see the terminal lights from his position at the fixed-base operation.

After this exchange with Yarbrough, Ricciuti switched to CTAF, contacting the Washington FSS at 2:44:29 A.M. Ricciuti told the Washington Flight Service Specialist he was five miles from the final ILS approach fix. At 2:45:10 A.M., the Service Specialist responded: "November six eight one Kilo Whiskey, Gainesville Radio. Gainesville remote advisory on the automated shows indefinite ceiling one hundred visibility quarter mile in fog..." The airport weather conditions were still below minimum for an ILS approach.

At about 2:46 A.M., flight N681KW crashed while attempting to land on Runway 29.

Plaintiffs claim that Strickland breached his duty of care in failing to provide proper air traffic control services to Ricciuti. They claim that Strickland should have (1) informed Ricciuti

---

[5] It is undisputed that the plane crashed on the first landing attempt.

that the weather at GNV was below minimums for an IFR landing; (2) provided Ricciuti with the weather conditions at alternative airports[6]; and (3) given additional services (weather services) due to the priority nature of the flight. The thrust of the Plaintiffs' argument is that Strickland had a duty to provide Ricciuti with the current weather conditions at GNV and he breached that duty by failing to gather and convey that information.

The United States is moving for summary judgment on the issue of causation. For the reasons discussed in Section III, it is unnecessary to address the duties and the standards of care for air traffic controllers or for pilots. Rather, this Order will only address the issue of whether a reasonable trier of fact could find that Ricciuti did not know that the weather conditions were below minimums to conduct an ILS approach. If Ricciuti did know the weather conditions were below minimums for an ILS approach, then any alleged failure by Strickland to inform Ricciuti of those conditions would not be the proximate cause of the crash.

## II. STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

---

[6] The Court notes that such an argument is unpersuasive as it is clear from the evidence that Ricciuti was aware of St. Augustine Airport as an alternative to GNV. See FAA TRACON Transcript, at 3 (ECF No. 40-5). In Abrisch v. United States, 359 F. Supp. 2d 1214 (M.D. Fla. 2004), a case with similar facts, the court ruled that it was not a breach of the duty of care when an air traffic controller did not inform a pilot of an alternative airport when the pilot was aware of the airport as an alternative and did not ask the controllers for alternatives or give them any reason to think he was in such distress that he needed to be provided with alternatives.

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of meeting this exacting standard. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Id.

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. Id. However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### III.  ANALYSIS

#### A.  Threshold Issue

As a threshold issue, this Court will decide whether this flight was conducted pursuant to Federal Aviation Regulation ("FAR")[7] 14 C.F.R. § 135 ("Part 135"), which applies to on-demand

---

[7] "Federal Aviation Regulations have the force and effect of law." Airplanes of Boca, Inc. v. United States, 254 F. Supp. 2d 1304, 1312 (S.D. Fla. 2003).

air taxi operations.[8]  Section 135.225 of title 14 of the Code of Federal Regulations states, in relevant part:

> [N]o pilot may begin an instrument approach procedure to an airport unless–
>
> (1) that airport has a weather reporting facility operated by the U.S. National Weather Service, a source approved by U.S. National Weather Service, or a source approved by the Administrator; and
>
> (2) the latest weather report issued by that weather reporting facility indicates that weather conditions are at or above the authorized IFR landing minimums for that airport.

14 C.F.R. § 135.225.  This regulation bars Part 135 pilots from commencing an ILS approach when weather conditions are below minimums.  Therefore, if Ricciuti was operating under Part 135, he was not permitted to begin an ILS approach at GNV because the weather conditions were below IFR landing minimums.  Conversely, if he were not operating under Part 135, he would be permitted to commence an ILS approach despite the weather.  See 14 C.F.R. § 91.

Flight N681KW was operating under Part 135.  Plaintiffs' own complaint in state court against Ricciuti and Air Key West submits that Ricciuti was flying a plane leased by Florida Aero Charter, Inc., and was employed by the company, which is an on-demand Part 135 air taxi operation.  Plaintiffs' State Court Compl. ¶ 5 (ECF No. 40-22).  They claim it was a Part 135 flight and that at all times during the subject flight Riucciuti was acting within the scope of his employment for Air Key West.  Id. ¶ 12.  Furthermore, according to the National Transportation Safety Board's ("NTSB") Factual Report, the subject flight was a Part 135 flight.  NTSB Factual Report (ECF No. 40-3).  Additionally, Air Key West has a policy that, on all flights, pilots should operate under Part

---

[8] Even if the flight was not conducted under 14 C.F.R. § 135, it would not change the analysis in Part B.  Ricciuti would still have been aware of the weather conditions at GNV and would ultimately have to make the decision to land or execute a missed approach.

135 of the FARs and divert when weather is below minimums. Dep. Robert Valle ("Valle Dep."), at 30:12-31:4 (ECF No. 40-14). There is no question that Ricciuti was required to operate according to the regulations of Part 135, and therefore was not permitted to commence an ILS approach.

### B. Negligence and Causation

Plaintiffs bring this suit under the FTCA, which states that the United States may be held liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The governing law under the FTCA is the law of the state where the alleged negligent act occurred. Richards v. United States, 369 U.S. 1, 11(1962). All parties agree that the Florida substantive law of negligence applies.

To prove negligence under Florida law, a plaintiff must show (1) the defendant had a legal duty; (2) defendant breached that duty; (3) defendant's breach was the actual and proximate cause of plaintiff's injury; and (4) plaintiff suffered damages resulting from defendant's breach. Airplanes of Boca v. United States, 254 F. Supp. 2d 1304, 1315 (S.D. Fla. 2003), aff'd, 112 Fed. Appx. 4 (11th Cir. June 17, 2004). In actions arising out of the operation of an aircraft, the ordinary rules of negligence apply. Scruggs v. United States, 959 F. Supp. 1537, 1544 (S.D. Fla. 1997).

Defendant seeks summary judgment on the sole issue of causation. To prove the defendant's action was a proximate cause of plaintiff's injury, plaintiff must demonstrate "that the defendant's alleged wrong caused the damage complained of. There must be such a natural, direct, and continuous sequence, between the negligent act and the injury that it can reasonably be said that but

for the act [or omission] the injury would not have occurred." Hensley v. United States, 728 F. Supp. 716, 722 (S.D. Fla. 1989) (citations and internal quotation marks omitted). Therefore, to show causation, Plaintiffs must show that the accident would not have occurred "but for" Strickland's failure to provide weather conditions.

The United States argues that Plaintiffs cannot prove Strickland's alleged negligence caused the accident because Ricciuti knew the weather conditions were below minimums for an IFR landing. Florida is a comparative negligence jurisdiction where several actors could be found negligent. See Hoffman v. Jones, 280 So. 2d 431, 437 (Fla. 1973). Hypothetically, Ricciuti and Strickland can simultaneously be held liable for the accident. However, under Florida law, comparative negligence "should not be construed so as to entitle a person to recover for damage in a case where the proof shows that a defendant could not, by the exercise of due care, have prevented the injury[.]" Id. at 438. Assuming Strickland had a duty, even if he had provided such information to Ricciuti, it would not have prevented the injury. Thus, it makes no difference whether Strickland breached the alleged duty.

The question is whether Ricciuti knew the weather conditions were below minimums. Based on the evidence submitted, this Court finds that pilot Ricciuti did have knowledge of the below minimum weather conditions. The United States has shown that Ricciuti made several comments indicating he was aware of deteriorating weather conditions. He told an air traffic controller in Tampa "looks like the weather is kinda tanking pretty good." Dep. Robert Cauble ("Cauble Dep."), at 55:1-12 (ECF No. 40-17). He then remarked to Strickland that "[t]he weather looks like it's going up and down sir." FAA TRACON Transcript, at 3. Accordingly, Ricciuti had

to have had a source of information that apprised him of weather conditions.[9] The Garmin MFD default display would have shown that GNV was experiencing adverse weather conditions, displaying a red icon indicating low IFR. Valle Dep., at 44:2-45:12. By pressing a button, Ricciuti could see any METAR or SPECI issued for GNV. Id. at 45:17-24; 48:1-15. A SPECI issued at 2:15 A.M., about thirty minutes before the crash, showed conditions at GNV were below minimum. GNV Local Climatological Data (40-7). It would be unreasonable to conclude that Ricciuti would not have been aware of the weather conditions when the display would have shown a red flag indicating adverse weather conditions for over thirty minutes.

Though Plaintiffs further state there is an issue of material fact as to whether the MFD was working during the subject flight, there are absolutely no facts that would support such a finding. There are several facts, however, that support that the MFD was working. First, Ricciuti had knowledge of the deteriorating weather conditions. Second, Robert Valle had recently used the MFD during a flight and reported it was operating without any problems. Valle Dep., at 45:25-46:5. Third, if the MFD was not providing weather information, it would be difficult to imagine a scenario in which an experienced pilot would not report this problem to any of the air traffic controllers with whom he spoke or would not request to change to the CTAF frequency. During the approximately thirty minutes pilot Ricciuti was in contact with Strickland, he made no mention of any difficulties with the MFD, nor did he make any remarks that would indicate he needed weather information. See FAA TRACON Transcript.

---

[9] The Court does not include the information relayed to Ricciuti by the Washington FSS as evidence he was aware of the below minimum conditions. This information was transmitted in the minute before the flight crashed. The Court therefore will not rely on this fact in its reasoning.

The cases cited by Plaintiffs to support the proposition that Strickland's failure to provide weather conditions caused the crash, are cases where the knowledge of deteriorating weather conditions could not readily be imputed to the pilot. See Abrisch v. United States, 359 F. Supp. 2d 1214 (M.D. Fla. 2004) (pilot did not have MFD on plane and was reliant on air traffic controllers to apprise him of deteriorating weather conditions); Martin v. United States, 586 F.2d 1206, 1209 (8th Cir. 1978) (pilot could not be charged with knowledge of change in visibility when drastic decrease in visibility occurred rapidly between two approaches); Worthington v. United States, 21 F.3d 399, 403 (11th Cir. 1994) (when at decision height, pilot did not know visibility had deteriorated to 1/16 mile); DeWeese v. United States, 576 F.2d 802, 803 (10th Cir. 1978) (pilot had no updated weather information); Himmler v. United States, 474 F. Supp. 914, 922 (E.D. Pa. 1979) (the pilot did not know the weather conditions); Webb v. United States, 840 F. Supp. 1484, 1521 (D. Utah 2004) (pilot did not have knowledge of possible whiteout phenomenon and therefore did not appreciate seriousness of the conditions). Here, the evidence establishes that Ricciuti knew of the below minimum conditions before attempting the ILS approach–he even knew conditions were deteriorating before initial contact with Strickland. See Cauble Dep., at 55:1-12. Moreover, the conditions at GNV did not suddenly deteriorate–conditions remained below minimum from the time the SPECI was issued at 2:15 A.M. See GNV Local Climatological Data.

Therefore, it was not Strickland's failure to convey weather information to Ricciuti that was the cause of the accident. Ricciuti already knew that weather conditions were below minimum for an authorized ILS approach. Strickland's alleged negligence is not the actual and proximate cause of the accident. Accordingly, summary judgment is warranted.

## IV.   CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Defendant United States' Motion for Summary Judgment (ECF No. 40) is GRANTED. All claims against Defendant United States are DISMISSED WITH PREJUDICE. The Clerk of Court is directed to CLOSE this case. All pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 4th day of January, 2011.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:   All counsel of record